Filed 6/16/22  Reed v. Aviva USA Corp. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JAMES E. REED, as Trustee, etc.,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>AVIVA USA CORPORATION, et al.,<br><br>Defendants and Respondents. | A158535<br><br>(Contra Costa County Superior Court Case No. C17-02212) |

Plaintiff James E. Reed appeals from a trial court order granting summary judgment in favor of respondents Aviva Life and Annuity Company and its successor, Accordia Life and Insurance Company (collectively, Aviva).  Reed contends there were triable issues of material fact related to the issue of whether death benefits were payable on a life insurance policy.  Uncontroverted evidence, however, established that the policy was not in effect at the time of the insured's death.  We therefore affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In 1988, when she was 59 years old, Priscilla Allen purchased a life insurance policy from Central Life Assurance Company.  After buying the policy, Allen transferred it to the Priscilla Allen Insurance Trust, with Reed as the trustee.  Through a series of transactions, the policy was acquired by various companies, eventually being held by Aviva as the insurer.

1

None of the parties were able to produce a copy of Allen's actual policy, but Aviva produced a "specimen policy" that a company official attested included the same terms as Allen's policy. Reed produced no evidence to the contrary.

The policy was a flexible-premium, adjustable-life policy, meaning that Allen could pay more than the cost of the premium, in which case the policy's surrender value would increase, or Allen could pay less than the cost of the premium, in which case any amount owed for the premium would be deducted from the account value, so long as it had positive balance, to keep the policy in effect. When the policy was issued in 1988, the annual premium was $17,088. As we discuss further below, the cost of the premium increased as Allen aged. By 2005, the annual premium was more than $24,000, and by 2010, it was more than $43,000. Reed seemingly, but incorrectly, believed the annual premium for the policy was fixed at $17,088.

The policy's account value was generally calculated by taking the prior month's account value, subtracting the monthly deductions, and adding premiums received and interest earned. If the account value was insufficient to cover the cost of a premium, the policy provided for a grace period for the insured to pay the amount owed. If this amount was not paid during the grace period, the policy lapsed, although the policy provided for a conditional reinstatement opportunity. Specifically, these terms were as follows:

> "GRACE PERIOD. This policy will stay in force for 60 days after the monthly due date on which the cash value is not sufficient to cover the monthly deduction then due. These 60 days are called the grace period. . . .
>
> "LAPSE. If sufficient premium is not paid by the end of the grace period, the policy and any additional benefit riders will end without value. We will mail you notice of the amount of premium that will be

2

sufficient to continue the policy in force at least 30 days before the end of the grace period.

. . .

"REINSTATEMENT. If the policy ends because a grace period ended without sufficient premium being paid, it may be reinstated. . . .

"To reinstate, we must receive an application to reinstate including evidence, satisfactory to us, that the Insured is insurable."

The policy year ran from November 18 through November 17 of the next year, and annual statements were sent to Reed in mid-November of each year the policy was in effect. Aviva produced the annual statements for the years ending in November 2003, 2004, 2005, 2006, 2007, 2008, and 2010. Reed does not dispute that he received these statements.

The statements contained a range of information. To begin with, they included the policy's account values at the beginning and end of the year. They identified additions to the account value, including premiums paid and interest earned, and they identified subtractions to the account value, including deductions taken to pay for premium deficiencies and other costs. Each statement identified the "planned premium" of $17,088 but also identified the "base cost of insurance," which was the actual premium cost for the year. Each statement projected a date the policy would lapse if only the amount of the planned premium were to be paid and deficiencies were satisfied by reductions to the account value.

For most years, Reed paid only the planned premium amount of $17,088. But because the actual premium cost increased as Allen aged,

3

premium deficiencies grew,[1] and these deficiencies were satisfied by reductions to the account value. Thus, the statements showed that as the actual premium cost increased, the account value fell. In 2004, the account value was more than $118,000, but by 2010 it had fallen to slightly more than $12,000.

In addition to notifying Reed that the account value stood at about $12,000, the 2010 annual statement informed Reed that the policy was expected to lapse within the next year. The statement showed that Aviva had received the planned premium amount of $17,088 in 2010, but it also showed that the actual premium cost was more than $43,000 that year.

In January 2011, Aviva sent Reed a notice stating that the policy had entered the grace period because the account value had dropped below what was needed to cover the premium. The notice explained that a premium payment of $8,600.08 was needed by the end of the grace period, March 19, 2011, to avoid a policy lapse. The notice also explained that if the payment was received, it would provide "coverage for one month beyond the grace period." Reed paid the $8,600.08, which kept the policy in effect through April 19, 2011.

In late April, Aviva sent Reed another notice stating that the policy had again entered the grace period because the account value had dropped below

---

[1] Reed claims that "no actual evidence" was presented that the premiums were expected to increase. He elaborates, "Quite to the contrary, [I] submitted evidence that indicates the premiums had remained the same for over decade and that none of the paperwork mailed to [me] by [Avila] indicated this would be changing in 2010 or otherwise." The contention is specious. The annual statements plainly identify the planned premium ($17,088) and the actual premium cost, which the statements show increased as Allen aged. Reed's apparent but unsupported belief that the premiums were fixed at the amount of the planned premium is not evidence that they were.

4

the amount needed to pay the monthly premium. The notice explained that a premium payment of $12,797.19 was needed by the end of the grace period, which this time ended on June 17, 2011, to avoid a policy lapse. The notice also again explained that if the payment was received, it would provide "coverage for one month beyond the grace period." Reed paid the $12,797.19, which kept the policy in effect through July 17, 2011.

In late July 2011, Aviva sent Reed yet another notice stating that the policy had again entered the grace period because the account value had dropped below the amount needed to pay the premium. The notice explained that a premium payment of $12,772.48 was needed by the end of the grace period, which this time ended on September 16, 2011, to avoid a policy lapse. The notice stated, "If this AMOUNT is not received by the end of the grace period, the policy will terminate except for the right to any cash value or non-forfeiture benefit." Reed did not pay the amount.

Two days after the grace period ended, Aviva sent Reed a "reinstatement offer," explaining that he could apply to reinstate the policy by submitting a premium payment of $12,772.48 within 10 days, along with a completed, signed application for reinstatement, including evidence of Allen's insurability. The notice stated, "Submitting the premium payment without this application is not sufficient."

On October 10, 2011, Reed sent Aviva a check in the amount of $12,772.48, but he did not send a completed, signed application for reinstatement. He did not send the completed application because it asked questions about Allen's insurability, and he believed Allen was no longer insurable.

On November 15, Aviva sent Reed a letter stating that the reinstatement form it received from him "was not complete" because "the

insurability questions were not answered," and that to reinstate the policy he would need to submit the reinstatement form with "all the insurability questions completed." The notice gave Reed until December 16, 2011, to submit the documentation. The notice explained, "[I]f we have not heard from you or received the completed requirements by then we will close out the request to reinstate this policy and return any premium submitted." (Boldface omitted.)

Reed did not submit a completed reinstatement form. On January 2, 2012, Aviva refunded the $12,772.48 and notified Reed that it could "no longer continue to hold open your reinstatement application." Reed made no further premium payments. Thus, the last premium on the policy was paid in June 2011. More than five years later, when she was about 87 years old, Allen died on September 4, 2016. After Allen died, Reed contacted Aviva and requested payment of death benefits under the policy. Aviva refused.

Reed filed this suit in November 2017. The operative complaint alleged two causes of action against Aviva, one for breach of contract and the other for promissory estoppel.[2] Aviva filed a motion for summary judgment, which the trial court granted. The court found that the breach of contract claim failed to the extent it was based on Aviva's refusal to pay the death benefit, "because it [was] undisputed that Reed paid no premiums in 2012, 2013, 2014, 2015, or 2016," and Aviva had therefore "established that the Policy was not in effect on the date of Allen's death." The court further found that the claim was barred by the statute of limitations to the extent it was based

---

[2] On appeal, Reed does not challenge the trial courts' ruling on the promissory estoppel cause of action, and we do not discuss it further.

6

on a theory that Aviva wrongfully terminated the policy in 2011.  This appeal followed the entry of the court's order.[3]

## II.
### DISCUSSION

*A.     Standard of Review*

"A motion for summary judgment is properly granted if 'there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment must present evidence that either 'conclusively negate[s] an element of the plaintiff's cause of action' or 'show[s] that the plaintiff does not possess, and cannot reasonably obtain,' evidence necessary to establish an element of the claim.  [Citation.]  If the defendant meets this burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto.'  (Code Civ. Proc., § 437c, subd. (p)(2).)

"We review the record de novo, 'liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.'  [Citation.]  'We affirm the trial court's decision if it is correct on any ground the parties had an adequate opportunity to address in the trial court, regardless of the reasons the trial

---

[3] No formal judgment appears in the record on appeal.  (Cf. *Swain v. California Casualty Ins. Co.* (2002) 99 Cal.App.4th 1, 6 [appeal is not from order granting summary judgment but from the ensuing judgment].)  But because the trial court's order granting summary judgment stated that Reed's claims against Aviva were "**DISMISSED WITH PREJUDICE** in their entirety," we construe the order as an appealable judgment because it showed a clear intent to finally dispose of Reed's complaint against respondents.  (*Ibid.*)

court gave.' " (*Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 832.)

> B.   *The Trial Court Properly Granted Summary Judgment in Favor of Aviva Because There Was No Triable Issue as to Whether the Policy Was in Effect When Allen Died.*

The operative complaint alleged that Aviva "breached the [c]ontract . . . when it failed to pay on the policy after receiving proof of [Allen's] death." (See *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 74 ["the pleadings determine the scope of relevant issues on a summary judgment motion"].)  In its order granting summary judgment, the trial court found that Reed could not establish such a breach because Aviva had sufficiently shown that the policy was not in effect at the time of Allen's death.  We agree.

At the outset, we reject Reed's contention that there were genuine issues of disputed material fact.  The contention is mainly premised on the charge that Allen's actual policy was not produced.  But in support of its motion for summary judgment, Aviva submitted the declaration of an officer with Aviva's parent company.  The officer declared he was familiar with the companies' record-keeping practices and the contents of Allen's policy.  He attested that a letter, a copy of which he attached to his declaration, identified the terms of Allen's policy as those contained in the company's form 00-600-00-0-0-5.  The officer also attached to his declaration a specimen policy for the company's form 00-600-00-0-0-5, declaring that it "contains all of the general terms and conditions of the Allen Policy, save for . . . [specific information about the policyholder], the date of issue, and the face amount of the policy."  This evidence was sufficient to satisfy Aviva's initial burden of establishing that the terms of the specimen policy were the same as Allen's policy. (See *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002)

8

28 Cal.4th 1059, 1074 ["there is no reason either in the law of contract or of evidence why secondary evidence that attests to the substance but not the precise language of an insurance policy should be insufficient as a matter of law to establish the insurer's contractual obligations"].) Accordingly, the burden shifted to Reed to show a triable issue that the terms were different. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*); *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 166.) He wholly failed to sustain this burden.

We therefore turn to the merits of the trial court's ruling on the breach of contract claim. "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) The policy here provided that Avila "will pay [death] benefits only if this policy is in force on the date of the Insured's death."

The trial court found that the policy was not in effect when Allen died because Reed had paid no premiums in 2012, 2013, 2014, 2015, or 2016. According to the court, "[w]hatever the precise terms of the policy, they necessarily included that some premium was due every year and had to be paid for the coverage to remain in effect." The court stated that Reed could "articulate no basis on which the policy could possibly have survived those failures to pay. To hold otherwise would be to say that if both the insurer and the insured have irretrievably misplaced the policy, a policyholder can just quit paying premiums for who-knows-how-many years, and still claim the death benefit on the ground that the insurer can't prove the policy's terms. That can't be right."

In agreeing with the trial court that Reed failed to establish a triable issue on whether the policy was in effect when Allen died, we similarly rely on the undisputed evidence that Reed made no premium payments from 2012 through 2016. But we also rely on the uncontested annual statements and other notices Aviva sent Reed. These statements and notices clearly showed that the policy's account value was diminishing and that the policy would, and eventually did, lapse.

Specifically, the 2010 annual statement informed Reed that the actual premium cost in 2010 was $43,906.67, that the policy's account balance was only $12,191.32, and that the policy was projected to lapse within the next year.[4] In 2011, Reed was repeatedly told that the grace period had been triggered. In September of that year, he was explicitly informed that if the amount owed was not paid during the grace period, "the policy will terminate except for the right to any cash value or non-forfeiture benefit." He did not pay the amount owed, and he was notified that the policy had lapsed. When Reed attempted to reinstate the policy by submitting a payment with an incomplete application, he was told he needed to submit the completed application, and he was informed that his failure to do so would cause Aviva to close out the request and return any premium. Reed submitted a reinstatement payment with an incomplete application, and early January

_____

[4] Reed argues that there was a dispute because in 2010 "he was not informed that the Policy would lapse for lack of increased premium payments." In support of the statement, Reed cites to a declaration he filed in the trial court attesting, "I do not believe I got a bill for the premium [in 2010] or if I did, I somehow overlooked it, so did not pay the usual bill in November." There is no triable issue. Regardless whether Reed received a bill, the 2010 annual statement informed him that Aviva had received the planned premium amount of $17,088, that the actual premium cost that year was more than $43,000, that the account value stood at about $12,000, and that the policy was expected to lapse within the next year.

2012 the amount of his reinstatement payment was returned. At that point, he was told that Aviva could "no longer hold open your reinstatement application."

In light of this undisputed evidence, Reed simply cannot claim a triable issue on whether the policy continued in effect, much less for five years, without him making any additional premium payments. As the trial court found, "Each Late Payment Offer here was clear regarding exactly how long the Policy would remain in effect if the payment were made. Reed would have known this, had he read the Offers – and he is charged with knowing this anyway, whether he read them or not." Reed presented no evidence to support the notion that that the policy—with its large annual premiums and depleted account value—continued in effect for more than five years without him making any further premium payments. At bottom, the policy's lapse occurred because of Reed's apparent failure to understand the policy and to carefully read and attend to the statements and notices that were sent to him.

Aviva satisfied its burden of persuasion of making a prima facie showing that the policy was not in effect when Allen died, and Reed failed to satisfy his burden of production to show a prima facie case to the contrary. (See *Aguilar*, *supra*, 25 Cal.4th at p. 850; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 780–781.) Consequently, the trial court properly rejected the breach of contract claim and granted summary judgment in Aviva's favor.[5] In light of this conclusion, we need not address the parties'

---

[5] We reject Reed's arguments that the trial court improperly weighed the evidence, that Aviva's actions constituted an anticipatory breach of contract, that the policy continued in effect despite Reed's nonpayment of premiums, and that Reed's failure to pay any premiums for five years "should be an issue of damages."

11

other disagreements—including any alleged factual disputes—regarding the application of the statute of limitations to a breach-of-contract theory that Aviva wrongfully terminated the policy in 2011, or that Aviva waived its right to deny that the policy was reinstated by depositing Reed's reinstatement check before returning the amount of the check to him.

## III.
### DISPOSITION

The trial court's order granting summary judgment in favor of Aviva is affirmed. Respondents are awarded their costs on appeal.

_____
Humes, P.J.


We concur:



_____
Margulies, J.



_____
Wiss, J. *



\*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Reed v. AVIVA USA Corporation, et al.* (A158535)