Filed 3/30/23  A.C. v. S.C. Anderson, Inc. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| A.C.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>S.C. ANDERSON, INC., et al.,<br><br>    Defendants and Respondents. | F083631<br><br>(Kern Super. Ct.<br>No. BCV-20-100469)<br><br>**OPINION** |

APPEAL from an order of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Zukor & Nelson and Marilyn H. Nelson for Plaintiff and Appellant.

Wood, Smith, Henning & Berman, Carlo A. Coppola, Nicholas M. Gedo, and Melissa Saracyan for Defendants and Respondents.

-ooOoo-

Plaintiff and appellant A.C. appeals from an order granting summary judgment in favor of defendant and respondent S.C. Anderson, Inc.'s (SCAI).  We elect to treat the appeal as a petition for writ review, deny the writ, and affirm the order.

## INTRODUCTION

This case involves a middle school student, A.C., who suffered injuries when he was struck by a motor vehicle as he walked near the vicinity of a construction site in the 11200 block of Harris Road in Bakersfield, California. A.C. contends a temporary chain link fence that protected the construction site blocked a dirt pathway forcing him to walk around the fence and into the bike lane of the adjacent road where he was struck by an approaching vehicle. A lawsuit was brought on A.C.'s behalf against the driver of the vehicle, the general contractor of the construction site (i.e., SCAI), and the subcontractor that supplied and erected the chain link fence.

## FACTUAL AND PROCEDURAL BACKGROUND

The following factual discussion is derived from the parties' evidence in support of, and opposition to, SCAI's motion for summary judgment.

## I. Factual Background

On the afternoon of January 14, 2020, A.C. was walking home from Warren Middle School. He usually took the bus home from school but, on this day, he missed his bus after getting into an altercation with a fellow student.

At deposition, A.C. testified he had earphones on and was listening to music playing on his phone during the whole time he was walking home. Upon leaving his school, A.C. walked south on Mountain Vista Drive and turned right along Harris Road and walked westward towards Buena Vista Road. During his journey, he was struck by a vehicle operated by defendant Francisco Martinez.

In interrogatory responses, A.C. indicated he was "walking in a westerly direction along a dirt path on Harris Road … when he was forced to step into the bike lane due to a fence negligently owned, created, constructed, managed, and maintained by defendant SCAI that blocked the dirt path." Defendant SCAI was the general contractor for the construction site and had contracted with defendant and cross-complainant Knight's

2.

Pumping and Portable Services, Inc. (Knight's) to install temporary fencing around the construction site.

A.C. was asked at deposition, "So, do you remember where the accident took place, generally?" A.C. answered, "No, I assumed before it was taken somewhere at the end of the road where the big dirt patch was where, if you cross [the] road, there's another dirt patch there, and I was guessing it was like in the middle of that like road." According to his deposition testimony, A.C. had no recollection of where he was hit. He was asked at deposition, "And what did you do once the sidewalk ended?" He responded, "I don't remember from there, because I think whenever I closed my eyes – it may sound a bit like odd and crazy, but I think my memory just blacked out from there. I think I just closed my eyes, and I just appeared in the hospital."

A.C. recalled that "at one point, [the sidewalk] ended," but he did not remember what he did when the sidewalk ended. He did not remember seeing the dirt path in front of him or walking on a dirt path. He did not remember seeing a chain link fence. When asked, "Do you remember walking in the bike lane at all?" he responded, "No." A.C. was also asked the following questions at deposition and gave the following answers:

Q. "And what was your end destination that day?"

A. "I don't understand.

Q. "Where were you trying to get to?"

A. "I was trying to cross the street at like Harris Road, not near like the dirt path, to like the other sidewalk area, at like the left, and then – and then I waited there at the other sidewalk to go to Buena Vista, to the Buena Vista sidewalk to go into the neighborhood. I don't know if that doesn't make sense or not, so, I'm sorry."

Q. "… So, was your plan to then turn left on Buena Vista Road to get to your neighborhood? Was that what you were planning to do?"

A. "Yes, after I crossed Harris Road and then go to like the sidewalk a bit more, I plan on to go to the sidewalk near – at Buena Vista Road, and

3.

then go after that to where the rest is going after Buena Vista – after that like turn right there, if that makes sense."

At deposition, Martinez, the driver of the vehicle that struck A.C., testified he was driving westbound on Harris Road. He confirmed stating in discovery responses that he was traveling approximately 25 miles per hour at the time of the incident. When asked the basis of his speed estimate, Martinez testified, "…I wasn't in no hurry. I mean, I don't – in that area, I would – I would say I was going about 25, roughly 25, maybe 30 [miles per hour]. But I don't know exactly what I was going, but it wasn't fast."

Martinez testified that, at the time of the incident, he was in the right hand lane, i.e., the lane next to the bike lane. Martinez testified he did not see A.C. prior to the impact. When asked when he first became aware of A.C.'s presence in the road, Martinez answered, "When he was literally in the corner of my right side of the [car], and that's where – that's where I hit him. It was like he just jumped out in front of that car, or that truck, I mean, and I was driving right by that truck on the—roadway. And he bolted out of there." Martinez said he slammed on his brakes immediately upon seeing A.C., but he could not avoid hitting A.C. Martinez testified A.C. was "running across the street" at "full speed" and "jumped out like a rabbit." A photograph taken at the scene by a responding officer of the Bakersfield Police Department showed significant damage to the front passenger side of the vehicle from the front bumper to the windshield.

Martinez testified at deposition that, after the impact with A.C., he did not pull over to the side of the road but, instead, "stopped in the middle – in the middle of the road where it happened." A photograph of Martinez's vehicle taken by a responding officer of the Bakersfield Police Department depicts Martinez's vehicle in the right lane (i.e., the number two lane). A man is depicted standing between Martinez's vehicle and the bike lane. From the photograph it appears the vehicle is at least six feet (and likely more) from the closest edge of the bike lane. Martinez denied being in the bike lane at

4.

the time of incident and stated a "truck was parked right there by the curb" and in the bike lane.

Martinez testified he placed his car in park, applied his parking brake, put his hazard lights on, located his phone on the floor in front of where his son was sitting, and called 911. Martinez then exited his vehicle to attend to A.C. who was lying in the roadway a couple of feet in front of his car. According to Martinez's testimony, A.C. was not in the bike lane at the time of impact. When asked "how far from the bike lane was [A.C.]," Martinez stated, "… I don't know. About 4 or 5 feet, maybe 6 feet. I'm not sure, to be honest with you. I don't know." He testified there was "no crosswalk in the roadway" where the accident occurred.

At deposition, Roy Ramirez De Leon testified he was in a vehicle "a few car lengths behind" Martinez's vehicle and stated Martinez was "driving normal" and was not swerving at all. He testified both vehicles were driving westward along Harris Road. He recalled, "[A]s I'm driving, straight ahead I see the car in front of me, but off in the distance I see a person [i.e., A.C.] walking on the side of the road." He testified he did not think there was a sidewalk at that location of the street, only dirt and A.C. was "walking on the edge there where the dirt is, not in the bike lane." He recounted, "As we get closer and closer and closer, suddenly this person darted across the street in front of this car to my shock and to my amazement, that's what I saw."

When De Leon was asked whether he ever saw A.C. "walking in the bike lane going westbound on Harris Road," he responded, "No, he was coming eastward." The question was repeated, and De Leon responded, "No, he was … he was always coming easterly on the side of the road, but I couldn't tell whether he was in the bike lane. It looked to me that he was mostly in the dirt area." De Leon confirmed that he saw A.C. "walking towards [him] easterly, and then [A.C.] darted out." He testified the impact did not occur in the bike lane, it occurred "in the roadway clearly, yes." "If [A.C.] had been in the bike lane," De Leon said, "he would have been totally safe." De Leon testified

A.C. "was looking in the direction he was running. He ran to the – he darted out to his right, and the body was facing right as he darted out in front of the car. That's the direction he was looking." Asked whether A.C. "look[ed] at the road to inspect whether there were any cars in it, just a visual inspection," De Leon answered, "Absolutely not." De Leon testified that A.C. was not walking but, rather, was running at "full speed." According to De Leon, A.C. "went from a walking [*sic*] to a running [*sic*] in front of the car."

De Leon testified, "The car that hit [A.C.] stayed in the road" and De Leon "pulled over to the side slightly behind him to the right." When asked if other cars were parked to the right in that area, De Leon answered in the negative. He stated, "I believe it was all open." He also testified, "When I was attending to the boy, I looked to my right. There's a fence there. There were workers over there, I believe, and I think the fence was open …." He did not see "any part of the fence jutting over the edge of the curb in the area where the impact occurred" either before the accident or as he was attending the boy.

However, Martinez testified the fence jutted into the roadway approximately two feet past the curb. Martinez also testified that in the several weeks prior to the incident, he had noticed the fence jutting out. He stated, "I did see it before the incident. I thought—and I told myself, in my head, I'm like, oh, that's weird, you know. I've never seen a fence like that before …." Martinez also testified there was more than one area of the fence that jutted past the curb. He stated, "[t]here was numerous that were past the curb. Not just one. There was, like, I would say, eight – six to eight, maybe nine that were jutting out." He indicated there was fence sticking out "every 6 to 8 feet." When asked "how far into the bike lane were they jutting?" he responded, "I would say about 2 feet. There was a solid foot or two. About 2 feet."

Martinez was asked at deposition, "[H]ow many [portions of the fence jutting out] did [he] see prior to where the incident occurred?" He responded, "About four." He was then asked, "How many areas where the fence was jutting into the bike lane did you see

6.

after where the incident occurred?" Martinez responded, "Probably roughly around another four." He testified these areas were around the area of the impact, but he could not say "if it was exactly at the point of impact."

A.C.'s mother was not a witness to the accident. However, she did arrive at the accident scene shortly thereafter. She testified that Harris Road has a total of four lanes, two in either direction. When she arrived at the scene, A.C. was lying in the roadway. Her testimony was "the road goes to turn to the left and to go straight, so he was kind of like in-between them." When asked if A.C. was in a specific lane when she arrived, she clarified "No, it was kind of like in-between the lane. It's a place where you turn right and it's one lane, and then it's kind of like a triangle with lines and then it's a straight line to go forward on Harris. He was kind of like in-between them." She was asked, "So he was in-between two different lanes?" and responded, "Yes." She also testified that when she arrived there was nothing in the bike lane. She was asked, "So the bike lane was open to your son if he wanted to walk in it a couple steps to get around the fence, correct?" She responded, "Yes."

Officer Brandon Carey of the Bakersfield Police Department was one of the responding officers. He testified at deposition that, upon arriving at the scene he observed Martinez's vehicle "in the westbound number 2 lane … in the 11100 block of Harris." He testified that he interviewed De Leon who stated, "he was also driving westbound on Harris Road just behind [Martinez's vehicle]" and that "he saw [A.C.] walking on the north side of the roadway and then abruptly leave the curb line going southbound across the road." De Leon told Officer Carey that "he didn't believe the vehicle in front of him could have stopped in time. There wasn't enough reaction time."

Officer Carey also interviewed Martinez who told him that "he was driving west on Harris Road in the number 2 lane," and "was going around a speed limit maybe a little bit less." Officer Carey said Martinez stated, "[H]e looked down he averted his eyes

7.

from the roadway, couldn't remember why he averted his eyes but as he was driving the vehicle then struck [A.C.]."

Officer Charles Jordan of the Bakersfield Police Department also responded to the accident scene. De Leon told Officer Jordan that "they were traveling westbound on Harris Road, both of them in the number 2 or right lane, and he said that he observed the kids, one of them being [A.C.], on the north shoulder of the roadway and then as … Martinez's vehicle was passing the location of the quote [*sic*] kid, one of them – one being [A.C.] – ran into the roadway directly into the path of … Martinez." When asked if De Leon indicated to him whether the impact occurred in the bicycle lane or in lane two, Officer Jordan responded, "He didn't tell me that … Martinez was traveling in the bicycle lane. [¶] He told me that he and … Martinez were traveling in the number 2 lane." Officer Jordan testified there were no crosswalks in the area where the accident occurred.

A professional civil engineer, Brad P. Avrit, P.E., and accident reconstructionist retained on behalf of A.C. provided a declaration in opposition to SCAI's motion for summary judgment. Avrit offered the following opinions, among others: (1) "[A.C.] could not proceed along the dirt path because it was blocked by the portion of the fence that reached to the curb, and thus he had to enter the street to continue along Harris Road"; (2) "the fence positioning directly caused and/or encouraged [A.C.] to enter the street, where he was exposed to vehicular traffic"; (3) "not only was [A.C.] forced to walk onto the roadway as he was blocked by the fence, but [A.C.] was also caused to walk a significant distance of 3 [feet] to 4 [feet] or more towards the center of the roadway in order to walk around the fence that was jutting out 2 [feet] into the street"; and (4) "it was foreseeable that [A.C.] would be caused to walk dangerously 3 [feet] to 4 [feet] or more towards the middle of the roadway."

8.

## II.    Procedural Background

A.C. filed suit in this matter on February 18, 2020.  A.C. filed his first amended complaint (i.e., the governing complaint) on April 30, 2020, alleging a single cause of action for negligence against SCAI.[1]  Named defendants included Martinez and SCAI.  Knight's was substituted in as a defendant for DOE-1.  Cross-complaints were filed by SCAI and Knight's.

On August 16, 2021, SCAI moved for summary judgment in its favor.  In its memorandum of points and authorities, SCAI states, that [A.C.] "alleges that he stepped off of the dirt path onto the westbound bicycle lane of Harris Road.  At that point, [A.C.] alleges that he was negligently struck by a[n] … automobile driven by … Martinez …."  SCAI noted that A.C. contends "Martinez entered the bicycle lane and struck and collided with [A.C.]."

SCAI contended the undisputed evidence demonstrates "Martinez'[s] vehicle was in the number two lane on Harris Road and not in the bicycle lane.  Contrary to [A.C.'s] contentions, the area of impact was several feet away from the bicycle lane."  SCAI argued, among other things, that the undisputed evidence shows A.C. "unlawfully darted

_____

[1] A.C. did not provide this court with a copy of his first amended complaint.  "[T]he pleadings set the boundaries of the issues to be resolved at summary judgment." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648.)  "When an appellate court reviews a ruling on a motion for summary judgment, it must identify the issues framed by the pleadings." (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 290.)  "It is the burden of [an] appellant to provide an accurate record on appeal to demonstrate error." (*Estrada v. Ramirez* (1999) 71 Cal.App.4th 618, 620, fn. 1.)  The failure to provide an adequate record on appeal has been held to "result[] in affirmance of the trial court's determination." (*Ibid.*; *Herrera v. Doctors Medical Center of Modesto, Inc.* (2021) 67 Cal.App.5th 538, 547.)  However, because representations have been made by SCAI that the first amended complaint alleges a single cause of action for negligence against it, and because SCAI's representations of allegations made against it appear consistent with the arguments presented by A.C. on appeal and in the trial court below, we accept SCAI's representations as to the allegations against it.

9.

across the street directly in front of Martinez'[s] vehicle…. Plaintiff darted across the roadway, not in a marked crosswalk, and onto oncoming traffic, without exercising any due care for his safety …." SCAI further argued A.C. cannot establish it owed A.C. "any duty of care, breached that duty, or that it caused and/or contributed to [A.C.'s] alleged injuries …."

Evidence submitted by SCAI in support of its motion for summary judgment included: (1) deposition testimony of A.C., Martinez and De Leon concerning the accident and the events that led to it and followed it; (2) deposition testimony of officers Carey and Jordan concerning the investigation that followed in the immediate aftermath of the accident; (3) deposition testimony of A.C.'s mother regarding her observations upon arriving at the accident scene; (4) evidence from the Bakersfield Police Department (i.e., a photograph of the scene taken by the officers, a compact disc containing officer bodycam video, and a traffic collision report); (5) A.C.'s written discovery responses; and (6) a declaration from an SCAI vice-president concerning SCAI's contract with Knight's for the fencing, its purpose, maintenance, and the lack of previous safety issues involving the fencing.

Evidence submitted by A.C. in opposition to SCAI's motion for summary judgment included: (1) additional deposition testimony from A.C., Martinez, De Leon, officer Carey, and A.C.'s mother; (2) additional photographs of the scene taken by Bakersfield Police Department officers; (3) written discovery responses from Martinez and A.C.; and (4) the declaration of retained expert Avrit.[2]

The hearing on SCAI's motion for summary judgment went forward on October 28, 2021. Following oral argument, the trial court took the matter under submission.

---

[2] The record on appeal does not include the written discovery responses from Martinez and A.C. that A.C. submitted in opposition to SCAI's motion and includes only one photograph taken by the responding officer(s). Again, it was A.C.'s burden to ensure an adequate record on appeal. (*Estrada v. Ramirez*, *supra*, 71 Cal.App.4th at p. 620, fn. 1.)

On October 29, 2021, the trial court issued its ruling. It overruled defendant's objections to A.C.'s evidence and granted SCAI's motion, finding SCAI "met its burden as the moving party and [A.C.] has failed to raise a triable issue of material fact." Among other things, the court found the evidence demonstrated (1) that there was no causal connection between the alleged negligently constructed and maintained fence; (2) that A.C. left the bike lane and entered the roadway when the accident occurred; and (3) that although the evidence showed the fence may have caused pedestrians to leave the dirt path and enter the bike lane, there was no evidence the fence "force[d A.C.] into the roadway beyond the bike lane" or "prevented [A.C.] from walking in the bike path." In addition, the court concluded, "the circumstances likely do not even support a duty of care …."

The trial court directed SCAI to prepare an order consistent with its ruling. A formal order granting SCAI's motion was entered on November 12, 2021. The Register of Actions (some capitalization omitted) indicates the order reads, in relevant part: "IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS: … [¶] 3. Defendant's S.C. Anderson, Inc.'s Motion for Summary Judgment is GRANTED…." A copy of the formal order was not included in the record on appeal.

On December 1, 2021, A.C. filed its notice of appeal.

## DISCUSSION

### I. This Court Elects to Treat A.C.'s Appeal as a Petition for Writ Review

#### A. *The November 12, 2021 Order, Arguably, Is Not a Final Judgment*

We first address whether the order appealed from is effective as a judgment. "Because such matters go to our jurisdiction, we must consider them even though they are raised by no party." (*Swain v. California Cas. Ins. Co.* (2002) 99 Cal.App.4th 1, 5 (*Swain*).) In *Swain*, the court noted "two potential imperfections in the 'judgment' " on appeal. (*Ibid.*) The judgment is *Swain* read, in relevant part, "It Is Therefore Ordered, Adjudged And Decreed that said Motion for Summary Judgment is granted and that

judgment shall be entered forthwith in favor of [the defendant] and against [the] plaintiffs …." (*Id.* at pp. 5–6, boldface type omitted.)

The *Swain* court noted "[a]lthough the boldfaced words suggest an intention that the order operate as a judgment, three other features point in the opposite direction: First there is no express declaration of the ultimate rights of the parties, such as that '[the] plaintiffs shall take nothing,' or 'the action is dismissed.' Second, the phrase 'judgment shall be entered forthwith' may be understood to complete a further, separate instrument – although it may be only a superfluous prediction of the clerical act of entry. Third, there is no mention of [the defendants'] cross-complaint, which so far as this record shows, remained pending. (See *Holt v. Booth* (1991) 1 Cal.App.4th 1074, 1081, …, quoting *Tsarnas v. Bailey* (1960) 179 Cal.App.2d 332, 337, … [' "[j]udgment rendered on a complaint alone, unaccompanied by judgment on a pending cross-complaint, is not a final judgment and appeal from it may be dismissed on motion" '].)" (*Swain*, *supra*, 99 Cal.App.4th at p. 6.)

The court in *Swain* determined it was within its power to correct any obstacle to appellate jurisdiction, writing, "because the trial court clearly intended to finally dispose of [the] plaintiffs' complaint against [the defendant], we can amend the order to make it an effective judgment. [Citations.] Similarly, because the order on summary judgment effectively disposed of the issues raised by [the defendant's] cross-complaint, we can amend it to do explicitly what it did only implicitly." (*Swain*, *supra*, 99 Cal.App.4th at p. 6.) The court then directed the trial court to "amend[] … the order granting summary judgment to declare that (1) judgment is entered nunc pro tunc on the complaint in favor of [the] defendant …, such that [the] plaintiffs shall take nothing and their action is dismissed; and (2) judgment is entered on the cross-complaint in favor of [the] defendant … such that the insurance policy described in said cross-complaint is declared not to afford coverage to [the] plaintiffs and not to create a duty to defend or indemnify them

12.

with respect to the losses tendered by them in connection with [a separate] action." (*Ibid*.)

The case before us bears some similarities to *Swain* and some differences. Similar to *Swain*, the language of the trial court's formal order of November 12, 2021 ("IT IS HEREBY ORDERED, ADJUDGED AND DECREED") suggests the court may have intended it to operate as a judgment; the order does not contain an "express declaration of the ultimate rights of the parties"; and there is no mention of SCAI's cross-complaint which, on the record before us, appears to remain pending. (*Swain*, *supra*, 99 Cal.App.4th at p. 6.) Unlike *Swain*, there is no directive that judgment be entered forthwith and, because the record on appeal does not include a copy of SCAI's cross-complaint, we are unable to determine whether the issues raised therein are disposed of by virtue of the court's order granting SCAI summary judgment. Thus, we cannot simply direct the trial court to amend the November 12, 2021 order to correct these deficiencies.

**B.** ***We Elect to Treat the Appeal as a Petition for Writ Review Since It Was Timely Filed for Such a Writ Petition and Will Promote Judicial Economy***

Under a variety of circumstances, courts have elected to treat the appeal of a nonappealable order as a petition for writ review. (*Jacobs-Zorne v. Superior Court* (1996) 46 Cal.App.4th 1064, 1072 (*Jacobs-Zorne*); *Green v. GTE California, Inc.* (1994) 29 Cal.App.4th 407, 410; *Branham v. State Farm Mut. Auto. Ins. Co.* (1975) 48 Cal.App.3d 27, 32 (*Branham*).) This approach has been taken in connection with an order granting summary judgment where no judgment was entered. (*Flojo Internat., Inc. v. Lassleben* (1992) 4 Cal.App.4th 713, 717, 718, fn. 1, 723 (*Flojo*); *Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 710 (*Lopez*); *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304 (*Johnson*).) Moreover, Code of Civil Procedure section 437c, the summary judgment statute, expressly provides for the possibility of writ review of an order granting summary judgment, to wit: "Upon entry of an order pursuant to this

13.

section, except the entry of summary judgment, a party may, within 20 days after service upon him or her of a written notice of entry of the order, petition an appropriate reviewing court for a peremptory writ." (Code Civ. Proc., § 437c, subd. (m)(1).)

In *Flojo*, the court reversed an order granting summary judgment despite the fact no judgment had been entered on the order. (*Flojo*, *supra*, 4 Cal.App.4th at pp. 717, 732.) As its basis for exercising jurisdiction, the court wrote, "No judgment was entered upon the basis of the order. While writ review may be taken from an order ([former] Code Civ. Proc., § 437c, subd. (l)), an appeal may be taken only from the judgment rendered upon the order granting the motion."[3] (*Flojo*, at p. 718, fn. 1.)

In *Jacobs-Zorne*, the court elected to treat the appeal of an order granting summary adjudication as a writ petition. (*Jacobs-Zorne*, *supra*, 46 Cal.App.4th at p. 1072.) The court noted that, if it denied review, "a determination of the parties' rights would be delayed until such time as a final judgment is entered, an appeal sought, and briefing by the parties completed. Clearly, this is not a speedy remedy for the parties and judicial economy would not be served by deferring resolution of the issue in dispute." (*Ibid*.)

In *Branham*, the court explained its rationale for electing to treat the appeal of a nonappealable order as a writ petition, as follows: " 'We are mindful of our limitations insofar as advisory decisions are concerned, but we are also impressed with our duty to see that justice is administered in a practical fashion with the least possible delay....' " (*Branham*, *supra*, 48 Cal.App.3d at p. 32.) The court further noted the desirability of " 'avoid[ing] … procedural obstacles that would have been " 'unnecessarily dilatory and circuitous….' " ' " and wrote, " '[w]e are justified in disposing of the procedural

---

[3] Former Code of Civil Procedure section 437c, subdivision (l) has been renumbered to Code of Civil Procedure section 473c, subdivision (m)(1).

14.

problems in a businesslike fashion in the interests of justice and to prevent unnecessary delay.' " (*Id.* at p. 33.)

In *Johnso*n, the court wrote, "Immediate writ review of an order granting summary judgment against some but not all of the defendants in a case is appropriate where the trial is proceeding against one or more codefendants. (*Lopez*[, *supra*,] 45 Cal.App.4th [at p.] 710, fn. 1 ….) Immediate review is preferable to obviate possible multiple trials in the case." (*Johnson*, *supra*, 143 Cal.App.4th at p. 304.)

Here, A.C.'s notice of appeal was filed on December 1, 2021, within 20 days of entry of the trial court's November 12, 2021 order, and, if treated as a petition for writ review, would be timely under subdivision (l) of Code of Civil Procedure section 437c. The parties have completed briefing on the issues relevant to appellate review and have not objected to this court's consideration of those issues on the merits. Moreover, we acknowledge the potential that a decision in this matter may affect issues that remain pending before the trial court – e.g., issues related to A.C.'s pending claims against Knight's, and, potentially, issues involved in the pending cross-complaints filed by Knight's and SCAI. Accordingly, we will treat A.C.'s appeal as a petition for writ review.

## II.     Standard of Review

The parties agree that the standard of review is de novo. "Whether the trial court erred by granting [a] motion for summary judgment is a question of law we review de novo." (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.) "This court applies the same analysis as the trial court. We identify the issues framed by the pleadings,[4] determine whether the moving party has negated the nonmoving party's claims, and determine whether the opposition has demonstrated the existence of a triable issue of material fact. [Citation.] Summary judgment is appropriate if all the papers submitted show there is no

---

**4** See footnote 1, *ante*.

15.

triable issue of fact and that the moving party is entitled to judgment as a matter of law." (*Orrick Herrington & Sutcliffe* v. *Superior Court* (2003) 107 Cal.App.4th 1052, 1056–1057.) "While we must review a summary judgment motion by the same standards as the trial court, we independently determine as a matter of law the construction and effect of the facts presented." (*Sellery v. Cressey* (1996) 48 Cal.App.4th 538, 543.)

## III.    Summary Judgment Law

"[I]n moving for summary judgment, a 'defendant … has met' his 'burden of showing that a cause of action has no merit if' he 'has shown that one or more elements of the cause of action … cannot be established, or that there is a complete defense to that cause of action.  Once the defendant … has met that burden, the burden shifts to the plaintiff … to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.  The plaintiff … may not rely upon the mere allegations or denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid*., fn. omitted.) "A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Ibid*.)

In addition, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of

material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) "A burden of production entails only the presentation of 'evidence.' " (*Ibid*.) "A burden of persuasion, however, entails the 'establish[ment]' through such evidence of a 'requisite degree of belief.' " (*Ibid*.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id*. at p. 851.)

" '[D]oubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.' " (*Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851–852.)

"[A] defendant moving for summary judgment [is not required] to conclusively negate an element of the plaintiff's cause of action…. [A]ll that the defendant need do is to 'show[] that one or more elements of the cause of action … cannot be established' by the plaintiff." (*Aguilar*, *supra*, 25 Cal.4th at p. 853, fns. omitted.) "Although he remains free to do so, the defendant need not himself conclusively negate" an element of the plaintiff's claim. (*Ibid*.) " '[G]iven the difficulty of proving a negative, … a test' requiring conclusive negation 'is often impossibly high.' [Citations.] The defendant has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence: The defendant must show that the plaintiff *does not possess* needed evidence, because otherwise the plaintiff might be able to establish the elements of the cause of action; the defendant must also show that the plaintiff *cannot reasonably obtain* needed evidence, because the plaintiff must be allowed a reasonable opportunity to oppose the motion [citation]." (*Id*. at p. 854, fn. omitted.)

## IV.    Analysis

"The elements of any negligence cause of action are duty, breach of duty, proximate cause, and damages." (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 687.)  In its motion for summary judgment, SCAI challenged three of those elements, i.e., the existence of a duty owed by SCAI to A.C., the breach of any such duty, and causation.  The trial court ruled in favor of SCAI on the causation issue.

Here, the evidence proffered by SCAI included the deposition testimony of A.C., Martinez, and De Leon.  All three were eyewitnesses to the events leading up to the accident.  No other eyewitness testimony was proffered by either party concerning the events that preceded the accident.

Martinez and De Leon's testimony indicated that A.C. was well into the roadway, and not in the bicycle lane when Martinez's vehicle struck A.C.  Martinez testified that he was in the number two lane when the accident occurred; that he was not in the bicycle lane; that he stopped his car "in the middle of the road where it happened."  Photographs taken at the scene show that Martinez's was stopped in the middle of the road six feet or more from the closest edge of the bicycle lane.  De Leon corroborated that A.C. was not in the bicycle lane when he was struck by Martinez's vehicle and that the accident occurred "in the roadway clearly"; that A.C. would have been "totally safe" had he, in fact, been in the bicycle lane; and that Martinez was "driving normal," not swerving, and within one of the lanes of the roadway.

The testimony of De Leon and Martinez, and the corroborative photographs submitted by SCAI in support of its motion for summary judgment were sufficient to meet its burden of production to demonstrate that no triable issues of material fact exist as to the element of causation and to shift the burden to A.C. to produce evidence sufficient to demonstrate triable issues of material fact related to causation do exist.

A.C. could not recall and did not testify to any of the salient details leading up to the accident except he was able to testify that he was looking at his phone, adjusting his

18.

earphones, and listening to music. He was unable to say whether or not he was walking in the bicycle lane, whether he was obstructed from walking in the bicycle lane, or whether he was forced into the roadway as a result of the fencing. Moreover, no favorable inferences in that regard can be drawn from his testimony. In fact, his testimony as to his intended path suggested he intended to cross Harris Road which is consistent with the testimony of De Leon and Martinez that A.C. actually entered a lane of traffic when the accident occurred.

The testimonies of the investigating officers do not support A.C.'s theory of liability against SCAI and the testimony of A.C.'s mother concerning whether her son was walking in the bicycle path was entirely speculative.

Finally, the declaration of A.C.'s retained expert, Avrit, is likewise insufficient to raise a triable issue of material fact with respect to causation. His opinion that A.C. was blocked by the fence and that it "caused and/or encouraged" A.C. to veer from the dirt path is followed by his conclusion that A.C. would have been forced to walk only three to four feet into the roadway – a distance that may or may not have put A.C. outside the boundary lines of the bicycle lane but certainly would not have caused A.C. to travel into the roadway where the undisputed evidence indicates he was struck. At most, Avrit's expert opinion is evidence the dirt pathway was blocked and that a pedestrian who desired to safely continue walking along Harris Road would have had to walk within, or slightly aside, the bicycle lane. Avrit's declaration does not purport to determine A.C.'s location or that of Martinez's vehicle when the accident occurred and, instead, merely assumes A.C. actually continued walking within, or aside, the bicycle lane as opposed to darting into the road or crossing the road. "To be admissible, an expert's opinion must be '[b]ased on matter … that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.' [Citation.] It must not be based on assumptions of fact without evidentiary support …." (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 165–166.) Here, there is no

19.

evidence that A.C. was walking within, or slightly aside, the bicycle lane when he was struck. The only evidence is that A.C. darted into the road as if he were, in fact, attempting to cross the road.

We conclude A.C. did not meet his burden of producing evidence sufficient to raise a triable issue of material fact relating to causation. We, like the trial court, are persuaded that no triable issue of material fact exists, and the facts demonstrate SCAI's fence was not a cause of the accident or A.C.'s injuries. Accordingly, we need not address whether SCAI owed A.C. a duty or whether SCAI breached that duty.

## DISPOSITION

Having elected to treat the appeal as a writ petition, we deny the writ. The trial court's November 12, 2021 order granting SCAI's motion for summary judgment is affirmed. Costs on appeal are awarded to SCAI.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

20.